Filed 8/30/21  P. v. Sutton CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WALTER JAY SUTTON,<br><br>    Defendant and Appellant. | H046538<br>(Santa Cruz County<br> Super. Ct. No. 17CR04855) |

A jury found defendant Walter Jay Sutton guilty on two counts of spousal rape; two counts of forcible oral copulation; two counts of assault with intent to commit a felony; sexual penetration by a foreign object; false imprisonment by violence; criminal threats; and various misdemeanors.  The trial court imposed an aggregate term of 20 years four months in state prison.

Sutton raises four claims on appeal.  First, he contends the trial court erred by denying his motion to appoint new counsel under *Marsden*.[1]  Second, he contends he was denied the right to effective assistance of counsel when the trial court denied defense counsel's motion to withdraw for a conflict of interest.  Third, he contends his counsel rendered ineffective assistance by failing to object when the trial court did not state its reasons for imposing full consecutive terms under Penal Code section 667.6,

---

[1] *People v. Marsden* (1970) 2 Cal.3d 118.

subdivision (c).[2]  Fourth, he contends the trial court erred by imposing a full consecutive term on the conviction for false imprisonment.

For the reasons below, we conclude these claims are without merit.  We will affirm the judgment.[3]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Procedural Background*

The prosecution charged Sutton with 16 counts:  count 1—criminal threats (§ 422); count 2—false imprisonment by violence (§ 236); counts 3 and 6—assault with intent to commit a felony (§ 220, subd. (a)(1)); counts 4 and 7—forcible oral copulation (§ 288a, subd. (c)(2)); counts 5 and 8—spousal rape (§ 262, subd. (a)(1)); count 9— sexual penetration by a foreign object (§ 289, subd. (a)(1)(A)); count 10—interference with a wireless communication device (§ 591.5); and counts 11 through 16—contempt of court (§ 166, subd. (c)(1)).

The jury found Sutton guilty on all counts as charged.  The trial court granted Sutton's motion to reduce count 1 to a misdemeanor and imposed an aggregate term of 20 years four months in state prison.  That term consisted of full consecutive terms of 16 months on count 2; two years each on counts 3 and 6; and three years each on counts 4, 5, 7, 8, and 9.  For the misdemeanors, the court imposed concurrent terms of six months on count 10, and one year each on count 1 and counts 11 through 16.

### B.  *Facts of the Offenses*

D.G., the victim, testified that she met Sutton in 2009 and married him in 2015. At first they got along well, but in December 2016, Sutton began to change.  He started acting paranoid, he was hearing things, and he accused D.G. of having an affair.  After D.G. made several attempts to address his strange behavior, including taking him to a

---

[2] Subsequent undesignated statutory references are to the Penal Code.
[3] Sutton also petitions this court for a writ of habeas corpus.  (*In re Sutton*, H048556.)  We deny his petition in a separate order on this date.

neurologist, Sutton admitted he was a methamphetamine addict and that he had started using it again. He tried going to treatment for a while, but he quit treatment and his erratic behavior continued to trouble D.G. She filed for divorce on July 7, 2017. The couple continued to live together at their residence for the rest of the month, while D.G. asked Sutton to sleep in a guest bedroom. He agreed to leave the residence.

On July 30, 2017, D.G. was staying at her parents' home. Sutton called her in the morning, told her he was packed to move out, and asked her to come to the residence to look at some repairs he had made. She agreed to go to the residence, and when she arrived, he invited her inside. Once they were inside, Sutton grabbed her by the arms and turned her around. D.G. told him she would call 911 and tried to get out her cell phone, but Sutton took it away from her, threw it on the floor, and stepped on it. Sutton started screaming that she had been having sex with other men and threw her onto the couch. She tried to get up, but he threw her back down and threatened to beat her if she moved. He kept demanding that she admit to having sex with other men, but when she tried to tell him she was not, he would cover her mouth with his hand and tell her to shut up. D.G. told him people would come looking for her, and he threatened to kill her if they did.

Sutton took out a pair of handcuffs, which terrified D.G. Then Sutton started talking about how he needed sex. D.G. did not want to have sex with him, but she was afraid that if she did not comply, "he was going to take it anyway," so she agreed to have sex with him to try to get him to calm down. Sutton put his hands on her and led her into the guest bedroom to perform oral sex on him. D.G. tried to escape out a sliding door, but he grabbed her, pulled her back inside, and threatened to beat her if she didn't stop making noise and do as he said. D.G. then orally copulated Sutton. He told D.G. to take her pants off, and he tried to penetrate her vagina with his penis. He was able to do so, "but just not very far." Sutton then grabbed D.G. and took her into the bathroom, where he orally copulated her and penetrated her vagina with his penis again.

3

After D.G. convinced Sutton to lie down in the bathtub, she was able to escape. She ran outside to a neighbor's house, where she knocked on the door, and the neighbor let her in. She was not wearing any pants. The neighbor gave D.G. a robe and let her use his phone to call the police.

A SART (Sexual Assault Response Team) examination was performed on D.G. later that morning. The SART nurse who examined D.G. testified to seeing multiple bruises, abrasions, and scratches at various places on her body. She had a laceration on her vagina, and her cervix was red. The injuries were consistent with the account D.G. had given.

The police arranged for D.G. to make a pretext phone call to Sutton. He admitted not letting her leave and putting his hands over her mouth, but claimed he just wanted to hear her admit the truth and didn't want her "to leave or take off." He said he "didn't want to hear a bunch of arguing." Sutton added, "[Y]ou have no idea how bad—how bad I feel that—that I felt then, how bad I feel now, how bad that whole thing. I didn't want to do none of that. That was not me by any means." When D.G. told him, "[Y]ou asked me to have sex and I didn't want to but I was scared," Sutton responded that he didn't know she was scared, and he said, "[T]hat's why I asked." He added, "Well, I asked you but, you know, I might have been a little rough but I did ask. I don't like that I was rough neither." He insisted that he had asked to have sex, and D.G. responded that she felt threatened and scared. Sutton stated, "I didn't mean to threaten you like that. I'm so sorry."

After police arrested Sutton, they searched his phone and found a text message to D.G. sent two days before the assault, stating, "[L]et's hook up one last time or there will be hell to pay."

At trial, Sutton took the stand in his defense. He testified that when D.G. came to the house that morning, he asked her to have sex, and she said, "[Y]es, but I want to get a drink of water first," whereupon she went to the bathroom. He followed her into the

4

bathroom and put his penis in her mouth at her request. Then Sutton's back began to hurt, so they moved to the bedroom, where Sutton touched her vagina with his fingers but did not penetrate her. After D.G. left to get some lubrication, there was no further sexual contact.

On cross-examination, the prosecution confronted Sutton with the transcript of a statement he had made to the police. Quoting from the transcript, the prosecutor asked Sutton if he had told the police, "And, uh, I don't know, we was fucking for a little while and she got fucking real antsy. But we fucked there and, uh, she goes, I'm thirsty, I want to get some water. And I said, okay, let's go in the bathroom. So we went in the bathroom and got some water. And I said, hey, we can fuck right here. So we was fucking right there and then, uh, that was when she pretty much, after ten minutes, I don't know how long, maybe it was 15 minutes, she got up, she was hot and I was fucking hot, we were both sweating like a dog." In his testimony, Sutton initially denied that he said this to the police and asserted that "none of that is true." He then added, "I could have said that, but that didn't happen."

## II. DISCUSSION

### A. *Denial of* **Marsden** *Motion*

Sutton contends the trial court erred by denying a post-trial *Marsden* motion based on claims of ineffective assistance of counsel, and he argues he and counsel had suffered a breakdown in communication. The Attorney General contends Sutton has failed to show the trial court abused its discretion in denying the motion.

#### 1. *Procedural History*

##### a. *Pretrial* **Marsden** *Motion*

Sutton first requested new counsel under *Marsden* during pretrial proceedings in March 2018. At a closed hearing on the matter, Sutton stated that he needed new counsel because "me and her don't get along at all, we don't talk." He claimed he had asked counsel a legal question, and she told him it didn't matter because she thought he was

guilty. He added, "[W]e have no communication at all." Counsel responded that during the last two visits to see Sutton in custody, he had ended the conversation sooner than she wanted to. She denied telling Sutton she thought he was guilty. She stated, "I'm trying my best to communicate with him, although he will sometimes just talk over me or choose to leave and then I can't get everything across." Sutton disputed this. Counsel told the court she had visited Sutton at least three times. The trial court found no sufficient cause to appoint new counsel and denied the motion.

The case proceeded to trial in October 2018, and on November 1, 2018, the jury found Sutton guilty on all counts as charged.

### b. *November 15* **Marsden** *Motion*

After the verdict, Sutton moved again for appointment of new counsel under *Marsden*, and the trial court heard the motion in a closed hearing on November 15, 2018. Sutton stated counsel was incompetent at trial and that she was hostile to him such that her representation had been ineffective. Sutton set forth several specific complaints. First, he claimed counsel had told him not to speak with the probation officer. Second, he claimed counsel had told him to stop taking his medication during trial, and that she then told him he would have to testify. Third, he claimed that on the first day of trial, when he stood up with the jury present, counsel told him, "[D]on't worry, they're not looking at your dick." Fourth, he complained that counsel had failed to have DNA evidence tested. Finally, he variously complained that she did not adequately contest flaws in the evidence and had not impeached D.G. with inconsistencies in her statements. Sutton added that he had submitted several complaints about counsel to the bar association.

Counsel then addressed these claims. First, she stated that the pants supplied to Sutton for trial were too large, and that they were bunched up. She indicated that she commented, "I'm sure nobody is staring at your crotch." Counsel stated that she never forced him to stop taking his medication and testify, and that it was his desire to testify.

6

She explained that she had gone to jail three times during trial to prepare Sutton to testify, and that each time he abruptly ended the meeting early. During this preparation, counsel told Sutton he sounded abrasive, and he responded that it was because his medications were suppressing his "softer, sadder feelings." He asked counsel if he should go off his medications, and she told him that if he felt comfortable with that, then it sounded like a good idea, so he did so.

As to the DNA evidence, counsel explained that DNA evidence taken from the victim in a SART exam had included DNA from another unidentified person in addition to the victim's own DNA. Counsel did not seek to have the DNA tested against Sutton's DNA because he had already confessed to the police that he had had sexual contact with the victim on the day of the assault. As to the probation interview, counsel told Sutton that if he engaged in denial or blaming others during the interview, it would not result in a good report, and that he should not talk with the probation officer if he was going to respond in that fashion. Counsel denied that the evidence was as flawed or the victim as impeachable as Sutton claimed they were.

At the conclusion of the hearing, the trial court found no grounds to support any claims of ineffective assistance, and the court denied the motion.

### c. *November 28* **Marsden** *Motion*

On November 28, 2018, the trial court again addressed an additional request by Sutton for new counsel. Counsel informed the court that Sutton had told her to move for a new trial on the ground that she had been incompetent. Counsel explained to Sutton that that would require appointment of new counsel because she could not ethically assert that her own performance constituted ineffective assistance. Counsel then told the court, "I think that Mr. Sutton has literally zero trust in me and no interest in working with me such that even though he didn't articulate it, I am concerned this is a break down in communication such that I can't really advise him at this point." The court then addressed Sutton and instructed him, "[Y]ou need to understand that you have to make a

7

good-faith effort to work with your lawyer and communicate with your lawyer. You don't get to just stop talking to her and make demands and expect a new lawyer, it doesn't work that way." Sutton responded, "Me and her never gotten along," and he denied that counsel was trying to communicate with him. Sutton asserted that counsel had been lying to the court, and he claimed that counsel had admitted to him she had been ineffective. Counsel denied that she had told Sutton she had been ineffective at trial, and she denied lying to the court. She stated, "I continued to try to rekindle a relationship with him and he continues to shut it down." After some further argument from Sutton reiterating the same claims he had raised before, the court found, "I haven't seen anything in the case to indicate to me that [Sutton's] not getting competent representation at any point."

Sutton asserted that he had told counsel three of the jurors were people he had known, and that counsel allowed them to stay on the jury throughout the trial. Counsel responded that Sutton had never told him any such thing, and counsel added, "I'm going to request at this point to be relieved because I do think that the break down in the relationship is irreconcilable, that we just can't be productive going forward with the way that he perceives me." The court ruled, "Mr. Sutton can't create his own conflict and break down in communication. He can't simply stop talking to you. He can't simply file complaints against you. He can't simply call you incompetent or a liar and say I'm not talking to her and the break down is irreconcilable. [. . . ¶ . . .] Mr. Sutton has to make a good-faith effort to try to communicate, work with his lawyer." Sutton continued to assert there had been a breakdown in communication, and the court found that any failure to communicate was caused by Sutton. The court asked counsel whether she was aware of any grounds to support a motion for a new trial, and she stated she knew of none. The trial court then denied the motion to appoint new counsel.

8

### d. Defense Counsel's December 7 Motion to Withdraw

On December 7, 2018, counsel moved to withdraw from the case based on an asserted conflict of interest. She informed the trial court that Sutton was "actively interfering" with relationships she had with other clients who were inmates at the same jail. She stated that she believed Sutton was circulating a petition around the jailhouse to have her disbarred, and that other people had signed it. She also stated that Sutton, through his sister under a durable power of attorney, had served the prosecution with a "Notice of Intention to Move for a New Trial." The document claimed, among other things, that defense counsel was liable to Sutton for five million dollars in damages as a result of her unlawful conduct. In addition to the "complete break down in communication" between counsel and Sutton, counsel claimed "he's rendering it impossible for me to do my job and be his attorney." Counsel argued that withdrawal was supported by Rule 1.16, subdivision (b)(4), of the State Bar Rules of Professional Conduct.[4]

The trial court again found that Sutton had not made a good-faith effort to communicate and cooperate with counsel, and that the law would not allow him to obtain new counsel simply by refusing to talk to his present counsel. Counsel argued that Sutton's conduct was interfering with her relationships with other clients, and that her duty of confidentiality to Sutton prohibited her from explaining the situation to those clients. But the court ruled that the other clients would have to decide whether to seek relief, while Sutton himself was not entitled to new counsel on this ground. Accordingly, the court denied the motion.

---

[4] Subdivision (b)(4) of Rule 1.16 provides that an attorney may withdraw from representing a client's conduct "renders it unreasonably difficult for the lawyer to carry out the representation effectively."

9

### 2. *Legal Principles*

"When a defendant seeks substitution of appointed counsel pursuant to [*Marsden*], 'the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of inadequate performance.  The defendant is entitled to relief if the record clearly shows that the appointed counsel is not providing adequate representation or that defendant and counsel have become embroiled in such an irreconcilable conflict that ineffective representation is likely to result.' [Citations.]" (*People v. Taylor* (2010) 48 Cal.4th 574, 599 (*Taylor*).)

"Ineffective assistance of counsel can also be the basis of a new trial motion. [Citation.]  Trial counsel, however, can hardly bring a new trial motion based on his or her own ineffective assistance; this situation presents an ' " inherent conflict." ' [Citation.]  Accordingly, [. . .], the Supreme Court held that 'a defendant is entitled to appointment of substitute counsel upon a proper showing posttrial or postconviction as well as pretrial.' [Citation.]  '[T]he trial court should appoint substitute counsel when a proper showing has been made at any stage.  A defendant is entitled to competent representation at all times, including presentation of a new trial motion.... [W]hen a defendant satisfies the trial court that adequate grounds exist, substitute counsel should be appointed.  Substitute counsel could then investigate a possible ... motion for new trial based upon alleged ineffective assistance of counsel.' [Citation.]" (*People v. Lucero* (2017) 18 Cal.App.5th 532, 538.)

We review the denial of a *Marsden* motion for abuse of discretion.  (*Taylor*, *supra*, 48 Cal.4th at p. 599.)  Denial is not an abuse of discretion unless the defendant has shown that a failure to replace counsel would substantially impair the defendant's right to assistance of counsel.  (*Ibid.*)

10

### 3. *Denial of the November 28* **Marsden** *Motion Was Not an Abuse of Discretion*

Sutton contends the trial court erred by denying the *Marsden* motion on November 28. He argues that he raised sufficient grounds to support a motion for new trial based on his claims of ineffective assistance of counsel. Specifically, he argues counsel was ineffective in two ways. First, he claims she should have sought a DNA test of the evidence taken from the victim during the SART exam. He argues it was relevant to the charge of spousal rape because if a test showed it was not his DNA, it would have supported his testimony that he did not penetrate the victim's vagina with his penis. Second, he contends counsel was ineffective for advising him to stop taking his medication during trial. He argues that counsel was not qualified to advise him on medication, and he points to comments the trial court made at sentencing.[5] He asserts that withdrawal from his medication may have had a negative effect on his testimony. Sutton further claims that the *Marsden* motion should have been granted based on a breakdown in communication between him and counsel.

The Attorney General contends Sutton failed to bring his post-trial *Marsden* motions in a timely fashion. Second, the Attorney General contends the trial court gave Sutton an adequate opportunity to voice his complaints about counsel. Third, the Attorney General contends Sutton did not show a sufficiently compelling degree of conflict existed between himself and counsel to justify appointment of new counsel. Fourth, the Attorney General argues that Sutton's complaints about his counsel's performance at trial reflected reasonable tactical decisions she made, not substandard performance. Finally, the Attorney General argues any error was harmless beyond a reasonable doubt.

---

[5] At the sentencing hearing, the court stated it was "troubled by the testimony," but the court did not state whose testimony it was referencing.

We agree with the Attorney General that Sutton has not shown trial counsel's performance fell below any professional standards to constitute ineffective assistance. First, counsel made the decision not to seek DNA testing from the SART exam evidence because Sutton had confessed to the police that he had sexual intercourse with D.G., such that the test results would have been immaterial. Counsel's decision was not unreasonable in this regard. Second, while Sutton contends counsel was not qualified to advise him on whether to discontinue his medications, counsel made clear that it was Sutton's decision not to take his medications for a short period. Sutton cites no authority for the proposition that counsel rendered substandard performance with respect to these decisions. Third, the record supports the trial court's finding that any breakdown in communication was due entirely to Sutton's own conduct and repeated refusal to engage with counsel. "A defendant may not effectively veto an appointment of counsel by claiming a lack of trust in, or inability to get along with, the appointed attorney. [Citation.] Moreover, the trial court need not conclude that an irreconcilable conflict exists if the defendant has not tried to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*People v. Smith* (2003) 30 Cal.4th 581, 606.) We conclude the trial court did not abuse its discretion by denying any of the *Marsden* motions.

Even assuming it was error to deny any *Marsden* motion, Sutton has not shown prejudice. "The standard for prejudice regarding a denied *Marsden* motion is under [*Chapman v California* (1967) 386 U.S. 18, 87]. Under that standard, we must ask whether the denial was harmless beyond a reasonable doubt. (*Ibid.*)" (*People v. Loya* (2016) 1 Cal.App.5th 932, 945.) Here, the evidence overwhelmingly supported the charges against Sutton. The victim's testimony was corroborated in part by the SART exam results showing trauma to her vaginal area in addition to various bruises and abrasions about her body. Moreover, Sutton confessed to the police that he had sexual intercourse with D.G. multiple times, and he admitted in the pretext phone call that he

12

had been "rough" with her, including threatening her and physically restraining her. Sutton points to nothing in counsel's performance, including the asserted breakdown in communication, that would establish a reasonable doubt about the harmlessness of the rulings.

### B. Denial of Defense Counsel's Motion to Withdraw

As set forth above in section II.A.1.d, trial counsel moved to withdraw on December 7, 2018, based on an asserted conflict with Sutton. She alleged Sutton had circulated a petition around the jailhouse seeking to have her disbarred, and that it had been signed by unspecified persons. Counsel argued this conduct was interfering with her relationships with other clients, and that she could not explain the situation to these other clients without violating her duty of confidentiality to Sutton. She argued that this conduct, together with the breakdown in communication between her and Sutton, had made it impossible for her to represent him effectively. The trial court denied the motion on the ground that the law would not allow Sutton to obtain new counsel by creating a conflict through his own conduct, nor by refusing to communicate or cooperate with counsel.

Sutton contends the trial court erred by denying counsel's motion to withdraw. He concedes that his own conduct created the conflict, but he emphasizes counsel's own assertion that she could not effectively represent Sutton going forward. He argues that the denial of the motion to withdraw affected the proceedings, including the subsequent sentencing and his desire to move for a new trial. The Attorney General contends the trial court properly denied the motion because there was no conflict between Sutton and counsel, and because Sutton manufactured the problem through his own behavior.

### 1. Legal Principles

The right to effective assistance of counsel includes the right to representation free from conflicts of interest. (*People v. Bonin* (1989) 47 Cal.3d 808, 834 (*Bonin*).) The California constitution includes the correlative right to conflict-free representation.

13

(*People v. Doolin* (2009) 45 Cal.4th 390, 419 (*Doolin*).)  "Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his [or her] responsibilities to another client or a third person or by his [or her] own interests."  (*Bonin*, at p. 835.)  Whether the claim comes under the state or federal constitution, these claims "generally require a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different."  (*Doolin*, at p. 417.)  "In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an actual conflict of interest 'that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citation.]"  (*Ibid.*)

"The determination whether to grant or deny a motion by an attorney to withdraw is within the sound discretion of the trial court and will be reversed on appeal only on a clear showing of abuse of discretion."  (*People v. Sanchez* (1995) 12 Cal.4th 1, 37, disapproved on other grounds by *Doolin*, *supra*, 45 Cal.4th 390.)

### 2. *Denial of the Motion to Withdraw Was Not an Abuse of Discretion*

Sutton concedes he created the asserted conflict of interest through his own conduct by "circulating paperwork to other jail inmates concerning counsel."  The trial court ruled that Sutton could not obtain new counsel by manufacturing a conflict, and the Attorney General contends this principle defeats Sutton's claim on appeal.

We agree with the Attorney General on this point.  The record is replete with instances of Sutton seeking to replace his counsel on other grounds, both before and after trial.  After the trial court denied his *Marsden* motions on multiple occasions, Sutton attempted to replace her through other means.  "[A] defendant may not force the substitution of counsel by his own conduct that manufactures a conflict."  (*People v. Smith* (1993) 6 Cal.4th 684, 696.)  This principle was applied in *People v. Hardy* (1992) 2 Cal.4th 86, 138 (*Hardy*).)  There, a defendant filed a federal lawsuit against his attorney

14

alleging negligent legal representation, whereupon the defendant sought to have the attorney replaced for this alleged conflict of interest. (*Id.* at p. 132.) The California Supreme Court concluded no actual conflict of interest existed under these facts. (*Id.* at p. 137.) Among other reasons, the court observed, "[I]t seems clear that Hardy was merely attempting to manufacture a possible conflict of interest to try and delay his trial. We conclude no actual conflict of interest is shown on these facts." (*Id.* at p. 138.)

Similarly, we perceive no actual conflict of interest on this record. This case differs from *Hardy* in that counsel herself brought the motion to withdraw, but the record does not show her representation of Sutton was actually affected by his conduct. Rather, as counsel stated, it was Sutton who was "rendering it impossible for me to do my job and be his attorney." As in *Hardy*, the client was "attempting to manufacture a possible conflict of interest" to force counsel's removal from his case. (*Hardy*, *supra*, 6 Cal.4th at p. 138.) The trial had already concluded, and although counsel filed no motion for a new trial, she also confirmed she was aware of no grounds to support such a motion. The asserted conflict hypothetically could have affected her post-trial representation in some other fashion, but Sutton does not demonstrate any such effect, and as we conclude below, we see no deficient performance. Counsel stated Sutton's conduct had "infiltrated" her relationships with other clients, but she did not indicate that her representation of Sutton himself was impacted. Sutton asserts that counsel's representation of him was affected at sentencing because she failed to raise certain objections, but he establishes no connection between the asserted conflict and the alleged deficiencies in representation. We conclude this claim is without merit.

### C. Failure to Object to the Trial Court's Failure to State Reasons for Imposing Full Consecutive Terms

Sutton contends counsel rendered ineffective assistance by failing to object when the trial court did not set forth its reasons for imposing full consecutive terms on counts 3 through 9 as required by subdivision (c) of section 667.6. The Attorney General contends

the trial court imposed those terms under subdivision (d) of section 667.6, such that the imposition of full consecutive terms was mandatory. The Attorney General further argues that even if the court was required to set forth reasons under subdivision (c) of section 667.6, counsel's failure to object does not warrant reversal.

### 1. *Legal Principles*

Under subdivision (c) of section 667.6, "a full, separate, and consecutive term *may* be imposed for each violation" of an offense specified in subdivision (e) (including the counts at issue here) "if the crimes involve the same victim on the same occasion." (§ 667.6, subd. (c), italics added.) If a court chooses to exercise its discretion to impose full consecutive terms under this section, "[w]hat is required is an identification of the criteria which justify use of the drastically harsher provisions of section 667.6, subdivision (c). [Citation.] The crucial factor, in our view, is that the record reflect recognition on the part of the trial court that it is making a separate and additional choice in sentencing under section 667.6, subdivision (c)." (*People v. Belmontes* (1983) 34 Cal.3d 335, 348 (*Belmontes*).)

Subdivision (d) of section 667.6 provides, "A full, separate, and consecutive term *shall* be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions." (§ 667.6, subd. (d), italics added.)

To show ineffective assistance, the defendant bears the burden to show any asserted deficiencies in counsel's performance resulted in prejudice. To show prejudice, the defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984) 466 U.S. 668, 694.)

### 2. *Defense Counsel Did Not Provide Ineffective Assistance of Counsel*

Sutton accurately points out that the trial court did not set forth its reasons for imposing full consecutive terms on counts 3 through 9. Sutton is also correct that a trial

16

court imposing full consecutive terms under subdivision (c) of section 667.6 must state its reasons for doing so on the record. (*Belmontes*, *supra*, 34 Cal.3d at p. 348.) Trial counsel did not object or request any statement of reasons for imposing full consecutive terms. The Attorney General disputes that the trial court relied on subdivision (c), and he argues the court relied instead on subdivision (d). That subsection mandates imposition of full consecutive terms and does not require a statement of reasons on the record.

Regardless of which provision the court applied, the record shows any objection by defense counsel would have been futile. Counsel argued in her sentencing memorandum that the court should impose concurrent terms because subdivision (d) of section 667.6 did not apply, and because mitigating circumstances justified the imposition of concurrent terms. The probation report further reflected that defense counsel sought concurrent terms, but the probation report recommended full consecutive terms for some counts based on subdivision (d). The prosecution's sentencing memorandum argued for full consecutive terms under subdivision (d) but further asserted that if the court applied subdivision (c) of section 667.6, the egregious nature of the offense still warranted full consecutive terms as matter of discretion.

At the sentencing hearing, the trial court prefaced its ruling by stating, "I had an opportunity to speak with the attorneys and a lot of what we are doing is talking about the different numbers as well as a lot of different ways to sentence Mr. Sutton. With the number of counts and how the laws are and some are complicated, so we had to do the math and try to figure out a direction, and I wanted to hear from [D.G.] and from Mr. Sutton and also from [Sutton's] sister to see what everybody's position was before I made a final decision on this case." This remark made it clear the parties had discussed sentencing issues off the record. The trial court then imposed the sentence but the court did not state whether it was relying on subdivision (c) or subdivision (d) of section 667.6. At the conclusion of sentencing, defense counsel stated, "I would like to put on the record a couple of things that were discussed in chambers. [. . . ¶ . . .] One of them is that I

17

would advocate -- I understand the Court's sentence, I was advocating for it to, at a minimum, run the two counts of Penal Code Section 220 concurrent as opposed to consecutive based on the de minimis nature of those, and I understand the Court in its discretion is not doing that." Counsel did not object to the lack of any statement of reasons from the trial court for imposing full consecutive terms.

The law is clear that the lack of any objection forfeited this claim on appeal. "[T]he waiver doctrine should apply to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices." (*People v. Scott* (1994) 9 Cal.4th 331, 353.) Accordingly, Sutton frames his claim as ineffective assistance of counsel. But he has not shown a reasonable probability of a more favorable outcome— i.e., that the trial court might have imposed a shorter aggregate term. The record makes clear that defense counsel argued for concurrent terms, and even assuming the court believed it had the discretion to do so under subdivision (c) of section 667.6, it chose not to impose concurrent terms. Sutton has not shown that he was prejudiced by counsel's failure to object because there is not a reasonable probability the court would have ruled differently if she had objected. We conclude this claim is without merit.

### D. Imposition of a Full Consecutive Term for False Imprisonment (Count 2)

Sutton contends the trial court erred by imposing a full consecutive term on count 2 for false imprisonment by violence. He argues that this offense is not one of the enumerated sex offenses subject to full consecutive sentencing under subdivisions (c) and (e) of section 667.6. The Attorney General contends the trial court applied subdivision (d) of section 667.6, under which full consecutive terms were mandated for counts 3 through 9 in addition to the full term on count 2 under section 1170.1.

#### 1. Legal Principles

As set forth above, subdivision (d) of section 667.6, provides in part, "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on

18

separate occasions." (§ 667.6, subd. (d).) This subdivision further provides, "The term shall be served consecutively to any other term of imprisonment and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination pursuant to Section 1170.1." (§ 667.6, subd. (d).) "Subdivision (d) removes the trial court's discretion to impose a more lenient sentence under section 1170.1 where two or more violent sex crimes are committed against more than one victim or where they are committed against the same victim on more than one occasion. In such an instance, the defendant must serve a full, separate and consecutive sentence for each conviction of an enumerated violent sex offense. [Citations.] Further, the term imposed under section 667.6, subdivision (d) 'shall not be included in any determination pursuant to Section 1170.1.' Thus, when a defendant is convicted of both violent sex offenses and crimes to which section 1170.1 applies, the sentences for the violent sex offenses must be calculated separately and then added to the terms for the other offenses as calculated under section 1170.1." (*People v. Pelayo* (1999) 69 Cal.App.4th 115, 124.)

Subdivision (c), allowing for discretionary imposition of full consecutive terms if the crimes involve the same victim on the same occasion, contains similar language regarding its application with respect to section 1170.1: "If the term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment. The term shall not be included in any determination pursuant to Section 1170.1." (§ 667.6, subd. (c).)

### 2. *Remand for Resentencing on Count 2 is Unwarranted*

As set forth above, the parties disagree on whether the trial court applied subdivision (c) or (d) of section 667.6 when the court imposed full consecutive terms on counts 3 through 9. If subdivision (d) applied, imposition of those terms was mandatory, and the court was further required to impose them in addition to the consecutive full term

19

for count 2 under section 1170.1. If subdivision (c) applied, imposition of full consecutive terms on counts 3 through 9 was discretionary. If the crimes "involve[d] the same victim on separate occasions" then subdivision (d) was mandatory.

"[I]f a defendant is convicted of both sex offenses and nonsex offenses, a trial court may properly designate the longest nonsex offense as the principal term and may treat all of the sex offenses under section 667.6, subdivision (c)." (*Belmontes*, *supra*, 34 Cal.3d at p. 346.) The court did not state whether count 2, false imprisonment by violence (a "nonsex offense") was a "principal" offense for purposes of section 1170.1. The court also did not state whether it was applying subdivision (c) or subdivision (d) of section 667.6, and the court made no findings on whether any of the offenses were committed on the "same occasion" (subdivision (c)) or "separate occasions" (subdivision (d)).[6]

Sutton contends the court must have applied subdivision (c) of section 667.6 because the court prefaced the imposition of sentence by indicating that it was using its discretion, stating, "[T]he Court will impose the following sentence used [*sic*] at its discretion." But the court still had the discretion to make other sentencing decisions under subdivision (d)—e.g., whether to impose a mitigated term on certain counts— regardless of which subdivision it applied. The court's reference to its use of discretion does not prove Sutton's contention, and does not clarify whether the court utilized the mandatory provision of section 667.6, subdivision (d), or the discretionary provision of section 667.6, subdivision (c).

---

[6] The parties below disputed whether the offenses took place on the "same occasion" or "separate occasions." The probation report recommended application of subdivision (d) on the grounds that counts 3 through 5 were committed on a separate occasion than counts 6 through 9. Sutton argues in his reply brief that no reasonable trier of fact could have found that all seven counts occurred on separate occasions. For the reasons below, we need not resolve this dispute.

In either case, we find no error here.  Even assuming the court sentenced Sutton under subdivision (c), the imposition of full consecutive terms was consistent with that subdivision.  The court had the discretion to designate count 2 as the principal offense and impose full consecutive terms for the remaining felony offenses under subdivision (c).  (*Belmontes*, *supra*, 34 Cal.3d at p. 346; *People v. Belasco* (1981) 125 Cal.App.3d 974, 983.)  Sutton points to nothing in the record to show such a decision was irrational or arbitrary.  Absent a showing to the contrary, we presume the trial court properly exercised its discretion.  " 'The burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.'  [Citation.]"  (*People v. Superior Court* (*Alvarez*) (1997) 14 Cal.4th 968, 977-978.)

We conclude this claim is without merit, and we will affirm the judgment.

### III.    DISPOSITION

The judgment is affirmed.

21

_____
Greenwood, P.J.

WE CONCUR:


_____
Grover, J.


_____
Danner, J.


People v. Sutton
No: H046538